[Cite as *State v. Lyle*, **2020-Ohio-4683.**]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190447 |
| | | TRIAL NO.   19CRB-9096 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ZION LYLE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Municpal Court

Judgment Appealed From Is:  Reversed, Appellant Discharged, and Cause
Remanded

Date of Judgment Entry on Appeal:  September 30, 2020

*Paula Boggs Muething,* City Solicitor, *William T. Horsley,* Chief Prosecuting Attorney, and *Jon Vogt*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffman*, Assistant Public Defender, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1}   Defendant-appellant Zion Lyle was convicted of carrying a concealed weapon in violation of R.C. 2923.12(B)(1) for failing to promptly inform the officers that he possessed a concealed handgun license ("CHL") and that there was a firearm in the vehicle.  He has appealed, and argues in two assignments of error that (1) the trial court erred in overruling his Crim.R. 29 motion for an acquittal and his conviction was based upon insufficient evidence, and (2) the court erred in revoking his CHL and ordering the forfeiture of his firearm.

{¶2}   The issues in this case are whether and when Lyle was "stopped for a law enforcement purpose" according to R.C. 2923.12(B)(1), and whether he "promptly" informed the police officers present that he possessed a CHL and that there was a firearm in the vehicle.

{¶3}   For the reasons discussed below, we sustain both assignments of error and reverse the judgment of the trial court.

### *Factual Background*

{¶4}   Cincinnati Police Officer Caleb Sarchet testified that he and several Hamilton County sheriff's deputies responded to a report of gunshots in the vicinity of Baymiller and Livingston Streets.  As they walked down Baymiller Street to investigate, Sarchet noticed a car occupied by two individuals parked on the side of the street.  As he approached the car, Sarchet noticed the passenger, who turned out to be Lyle, twice turn toward the back seat and then back to the front.

{¶5}   Footage from Sarchet's body camera was played during trial.  At the 45-second mark, Sarchet knocked on the passenger window and asked Lyle to roll it

down. Once the window was down, he asked Lyle and the driver if they had heard any gunshots, to which they both said that they had not. Sarchet testified that at that point he could smell burnt and raw marijuana coming from the vehicle, could see marijuana residue on the driver's pants, and observed what appeared to be an open container of alcohol in the center console. He did not mention any of this to the occupants of the vehicle.

{¶6} Sarchet asked the driver, "Hey, real quick, can I talk to you for one second?" As Sarchet walked over to the driver's side, he told one of the deputies to watch the passenger door. The driver got out of the car and walked back toward Sarchet. Sarchet ordered him to face the car and patted him down. He asked the driver, "Hey, where's your weed at?" The driver denied having any. Sarchet handcuffed the driver, sat him down on the curb, and questioned him about the marijuana. Three minutes and ten seconds into the video, the deputy standing by Lyle's door turned toward Sarchet and said, "There's a gun in the backseat."

{¶7} Sarchet and the deputy then prepared to remove Lyle from the car. The deputy told Lyle, "I'm going to put you in handcuffs alright? You're not in trouble, but we're going to put you in handcuffs." While the deputy and Sarchet removed Lyle from the car and patted him down, Lyle told them that he had a "license." Sarchet pulled Lyle's CHL card out of his wallet, and Lyle said, "Right there, my CCW." Sarchet asked Lyle why he had not told him earlier, and Lyle said that he had told the deputy that had been standing by his door. Sarchet testified that as he patted Lyle down, he discovered that Lyle was wearing an empty holster, prompting him to believe that Lyle had moved the firearm to the backseat as police approached the car.

{¶8} The officers retrieved the firearm, which had been partially hidden under a booster seat in the backseat of the car. The officers also found a small bag of fentanyl next to the gun. Lyle was arrested for the fentanyl and for failing to promptly inform the officers of the firearm and his CHL. The fentanyl charge was ultimately ignored by the grand jury.

{¶9} On cross-examination, defense counsel asked Sarchet what law he was intending to enforce as he approached the vehicle. Sarchet testified that at that point it was "just an investigation. I was just talking to them as I would talk to any other person. * * * My intention was simply to investigate the call that I was on for gunshots heard in the area."

{¶10} After a bench trial, the court found Lyle guilty, sentenced him to probation for one year, ordered him to pay a fine of $150 and court costs, revoked his CHL, and ordered forfeiture of the firearm.

### First Assignment of Error

{¶11} In his first assignment of error, Lyle argues that the trial court erred in overruling his Crim.R. 29 motion for an acquittal and that his conviction was based upon insufficient evidence.

{¶12} The test for determining if the evidence was sufficient to sustain a conviction is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). It is a question of law for the court to determine, the court is not to

weigh the evidence. *MacDonald* at ¶ 12. "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

{¶13} A motion for an acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶14} Lyle was convicted of carrying a concealed weapon in violation of R.C. 2923.12(B)(1), which provides:

> (B) No person who has been issued a concealed handgun license shall do any of the following:
>
> (1) If the person is *stopped for a law enforcement purpose* and is carrying a concealed handgun, fail to promptly inform any law enforcement officer who approaches the person after the person has been *stopped* that the person has been issued a concealed handgun license and that the person then is carrying a concealed handgun.

(Emphasis added.)

{¶15} There are two crucial questions in this case: (1) at what point during the interaction was Lyle "stopped for a law enforcement purpose," and (2) when stopped, did Lyle "promptly inform" the officers of the firearm and that he possessed a CHL?

{¶16} The purpose of the "promptly inform" requirement is for officer safety, so that during an interaction between an officer and a CHL holder, the officer is

aware that there is a firearm in the CHL holder's possession. *See State v. Griffin*, 2020-Ohio-3707, ____N.E.3d____, ¶ 28 (1st Dist.) (discussing R.C. 2923.16(E)(1), which requires a CHL holder "stopped as a result of a traffic stop" to promptly inform an officer of his license and firearm). However, R.C. 2923.12(B)(1) does not state that a citizen is under a duty to disclose his firearm and CHL any time he comes in contact with police. The General Assembly made it clear that the duty does not arise until a citizen is "stopped for a law enforcement purpose."

{¶17} When Sarchet knocked on the passenger window and asked Lyle and the driver whether they had heard any gunshots, he and the other officers were performing a "law enforcement purpose." However, Sarchet testified that he "was just talking to them as I would talk to any other person. * * * My intention was simply to investigate the call that I was on for gunshots heard in the area." We find the encounter to be consensual at that point.

{¶18} The state argues that a consensual encounter can be a "stop" under R.C. 2923.12 if the encounter was for law enforcement purposes. However, this is contrary to the plain language of the statute and any legal or nonlegal definition of stop. A stop necessarily entails a seizure of some degree. *See Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/stopped (accessed September 1, 2020) (inter alia, defining "stop," as "to hinder or prevent the passage of," and "stopped" as "to arrest the progress or motion of: cause to halt"); *see State v. Mitchem*, 1st Dist. Hamilton No. C-130351, 2014-Ohio-2366, ¶ 17, citing *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1982) ("For purposes of determining the protections afforded by the Fourth Amendment, the United States Supreme Court has identified three categories of police-citizen

6

contacts: (1) a consensual encounter; (2) an investigative, or *Terry,* stop; and (3) a seizure that constitutes an arrest."); *State v. Hill*, 127 Ohio App.3d 265, 270, 712 N.E.2d 791 (1st Dist.1998) (holding that "[t]he trial court erred as a matter of law when it held that Hill was seized when the police first began to chase him, since there was no physical contact, and Hill, in running away, cannot be said to have submitted to the officers' show of authority.").

{¶19} Where an encounter between police and the public is consensual, there is no seizure. *State v. Boys*, 128 Ohio App.3d 640, 642, 716 N.E.2d 273 (1st Dist.1998). "A seizure does not occur simply because a police officer approaches an individual and asks a few questions," including when the individual is sitting in a parked car. *Id.* Thus, a consensual encounter with the police does not amount to a "stop" under R.C. 2923.12. Lyle was not "stopped" when Sarchet asked him and the driver whether they had heard any gunshots.

{¶20} This interpretation of R.C. 2923.12 is supported by *City of Strongsville v. Johnson*, 2017-Ohio-7066, 95 N.E.3d 809, ¶ 15 (8th Dist.). In *Johnson*, the defendant's car had run out of gasoline and was stalled in the roadway when officers approached the car to offer assistance. *Id.* The officers asked the defendant for his driver's license, but he refused to give it to them. *Id.* at ¶ 1. The officers physically removed the defendant from the car and arrested him, at which time they discovered that there was a firearm in the car and that he possessed a CHL. *Id.* The defendant was convicted for violating R.C. 2913.12(B)(1). *Id.* at ¶ 14. The Eighth District held that the defendant was not "stopped," and reversed the conviction. *Id.* at ¶ 15. While the court did not provide much analysis, it clearly believed the defendant was not

"stopped" because the police approached his already-stopped vehicle to offer assistance and not because they were intending to enforce any law. *See id.*

{¶21} In Lyle's case, the trial court found, and the state argues, that once Sarchet saw and smelled marijuana, the encounter was "converted" from a "neutral" encounter into a law enforcement stop, and that Lyle should have informed Sarchet about the firearm and his CHL at that time.

{¶22} Whether an individual was stopped is an objective test based on an officer's conduct. *See Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (to determine whether a seizure occurred under the Fourth Amendment, a court must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."). Therefore, that Sarchet considered the encounter to be a drug investigation once he saw and smelled the marijuana is insufficient to change the consensual nature of the encounter into a stop unless his conduct indicated such a change to Lyle and the driver. Sarchet did not mention marijuana or indicate in any way that the encounter had evolved into a drug investigation until he was questioning the driver, alone, behind the car. Therefore, we find that Lyle was not stopped at the point Sarchet smelled and saw marijuana.

{¶23} So how do we answer the question of when Lyle was "stopped for law enforcement purposes?" Fourth Amendment caselaw is instructive to our analysis. A seizure occurs when the officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *California v. Hodari D.,* 499 U.S. 621, 625, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), quoting *Terry v. Ohio*, 392 U.S. 1,

19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Police questioning, by itself, is unlikely to result in a seizure under the Fourth Amendment. *I.N.S. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id.*

{¶24} The state contends that even if the encounter was initially consensual, it evolved into a stop once Sarchet made a "show of authority" by asking to speak with the driver and telling the deputy to keep an eye on Lyle in the passenger seat.

{¶25} We disagree with the state's contention. Sarchet did not order the driver out of the car; he simply asked to speak with him and walked over to the driver's side while directing one of the deputies to watch the passenger's side. The driver exited from the car on his own volition and walked back toward Sarchet, who was standing at the rear of the vehicle on the driver's side. The encounter undoubtedly evolved into a stop *of the driver* once Sarchet ordered him to face the car, patted him down, and placed him in handcuffs at approximately one minute 15 seconds into the body camera video.

{¶26} While Sarchet was dealing with the driver (for approximately two minutes), his body camera video showed the deputy standing by Lyle's door appearing to talk with Lyle. Lyle testified that he informed the deputy of the firearm before he was removed from the car. The video seems to confirm this due to the fact that at approximately three minutes ten seconds, the video shows the deputy, after speaking with Lyle, inform Sarchet there was a firearm in the backseat of the car. Curiously, the state did not call the deputy as a witness at trial.

9

{¶27} The encounter began as a consensual encounter, and besides a deputy standing outside his door, the state did not present any evidence that the officers gave any indication that they were stopping Lyle until they prepared to remove him from the vehicle. By that time, Lyle had informed the deputy of the firearm, and informed him that he possessed a CHL shortly thereafter. Perhaps the deputy's conduct did indicate to Lyle that he was stopped sometime during the two minutes after the driver was stopped and before Lyle was removed from the car, but the state did not present any testimony on that subject.

{¶28} We hold that, even in the light most favorable to the prosecution, it did not present sufficient evidence that Lyle failed to "promptly inform" the officers of his CHL and the firearm after being "stopped for a law enforcement purpose." Lyle's first assignment of error is sustained and his conviction for carrying a concealed weapon in violation of R.C. 2923.12(B)(1) is reversed.

### *Second Assignment of Error*

{¶29} Since Lyle's conviction is reversed, there is no basis for his firearm to be forfeited or his CHL to be suspended. His second assignment of error is sustained.

### *Conclusion*

{¶30} Because Lyle was not "stopped for a law enforcement purpose" until after he had disclosed that there was a firearm in the vehicle, his conviction under R.C. 2923.12(B)(1) was based upon insufficient evidence. Both assignments of error are sustained. The judgment of the trial court is reversed, appellant is discharged from further prosecution on the charge of carrying a concealed weapon in violation

of R.C. 2923.12(B)(1), and the cause is remanded for the trial court to vacate the forfeiture and suspension orders.

Judgment reversed, appellant discharged, and cause remanded.

**Bergeron, J.,** concurs.
**Myers, P.J.,** dissents.

**Myers, P.J.,** dissenting.

{¶31} Because I would find that Lyle failed to "promptly inform" the officer that he had a gun and a concealed handgun license after being "stopped for a law enforcement purpose," I respectfully dissent.

{¶32} I agree that the first issue we must decide is when, if ever, Lyle was "stopped" for a law enforcement purpose. As the majority recognizes, the officers were engaged in a law enforcement purpose when investigating a shooting in the area where Lyle and his friend were parked. And I would find that under the plain meaning of the statute, Lyle was "stopped" for this purpose the moment the officers approached him and asked him to roll his window down.

{¶33} The majority relies on well-established search-and-seizure law when coming to its conclusion that Lyle was not "stopped" when the officers told him to roll down his window and questioned him. I agree that Lyle was not "seized" at this point. Nor was he "detained" or "arrested." Under Fourth Amendment principles, this likely was a "consensual encounter." But I disagree that this is the correct analysis to be used in this case.

{¶34} As recognized by the majority, the purpose of R.C. 2923.12(B)(1) is officer safety. In return for the privilege of being able to carry a concealed gun, the

state requires in return that its armed citizens inform law enforcement that they are carrying a weapon. This involves none of the issues and constitutional rights sought to be protected by search-and-seizure laws, which protect citizens from unlawful intrusions by their government. The requirement to disclose a lawful activity (permission to carry a concealed weapon and lawfully carrying the weapon) simply cannot be analyzed under unlawful-seizure cases.

{¶35} This leads me to the meaning of "stop" under R.C. 2923.12(B)(1). Even assuming a "consensual encounter" under Fourth Amendment law (meaning Lyle was not detained and free to go), I would find Lyle was "stopped" for a law enforcement purpose when the officer rapped on his window and started asking questions about the shooting. This is particularly true in this case where the officer was outside of the car door, essentially blocking Lyle's exit. And under the dictionary definition cited by the majority, his passage out of the vehicle was halted. And even if not stopped immediately, Lyle was surely "stopped" early on in the encounter when the deputy was assigned to stand outside his door while the other officer was dealing with the driver.

{¶36} Having concluded that Lyle was stopped when the officer began his investigation, I would find that Lyle did not "promptly" disclose the weapon and his license to carry. Again, recognizing the purpose of officer safety, a citizen is required to inform the officer of the gun. While "promptly" does not mean immediately, it is pretty close. And, it certainly is not three minutes into the investigation, when the officer apparently is alerted to the gun.

{¶37} The majority relies on *City of Strongsville v. Johnson*, 2017-Ohio-7066, 95 N.E.3d 809 (8th Dist.). In that case, the court first determined that unlike

12

our case, the encounter with the motorist was not for a law enforcement purpose. The court then went on to say that the defendant was not "stopped." While I could distinguish this case on its facts, I also think that the majority in that case read the statute's use of stop too narrowly. *See Strongsville* at ¶ 28-33 (Keough, J., dissenting).

{¶38} When a citizen is permitted to carry a concealed weapon, the legislature has put a corresponding duty on the citizen to alert police that the citizen is carrying a gun when stopped for a law enforcement purpose. This is not an onerous burden, and involves no intrusion on constitutional rights protected by the Fourth Amendment. There was sufficient evidence supporting Lyle's conviction, and I would therefore affirm the trial court's judgment.

Please note:

The court has recorded its own entry on the date of the release of this opinion.