[Cite as *State v. Stewart*, 2021-Ohio-2928.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellant,          :

                            Nos. 109867 and 109868

    v.                             :

JAMES STEWART, ET AL.,                  :

    Defendants-Appellees.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** August 26, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-19-645843-A and CR-19-645843-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Tasha L. Forchione, Assistant Prosecuting Attorney, *for appellant.*

Regis E. McGann, *for appellee* James Stewart.

Cullen Sweeney, Cuyahoga County Public Defender, and Paul A. Kuzmins, Assistant Public Defender, *for appellee* Leeandrew Ealom.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, the state of Ohio, appeals an order granting two motions to suppress filed by defendants-appellees, James Stewart ("Stewart") and

Leeandrew Ealom ("Ealom") (collectively "appellees"). The state claims the following error:

> The trial court erred in granting James Stewart and Leeandrew Ealom's motion to suppress.

{¶ 2} We find merit to the appeal, reverse the trial court's judgment, and remand the case to the trial court for further proceedings.

## I. Facts and Procedural History

{¶ 3} Ealom and Stewart were charged in a nine-count indictment with three counts of drug trafficking in violation of R.C. 2925.03(A)(2) as alleged in Counts 1, 3, and 5; four counts of drug possession in violation of R.C. 2925.11(A) as alleged in Counts 2, 4, 6, and 7; and one count of possessing criminal tools in violation of R.C. 2923.14(A) as alleged in Count 8. Counts 1 through 8 included forfeiture of a scale, a cell phone, a gun, and money. Counts 3 and 5 included firearm specifications pursuant to R.C. 2941.141(A). In Count 9, Ealom, alone, was charged with improper handling of a firearm in a motor vehicle in violation of R.C. 2923.16(E)(1).

{¶ 4} Stewart and Ealom each filed a motion to suppress, arguing that Cleveland police did not have probable cause to initiate the traffic stop that led to the discovery of contraband. They further argued that officers detained them without reasonable suspicion and that the subsequent search of their vehicle was unlawful.

{¶ 5} The state opposed the motions to suppress, arguing the initial traffic stop was lawful because Stewart, who was driving the vehicle, was driving erratically,

changed lanes multiple times without signaling, and later turned out of a gas station parking lot without signaling. The state argued that changing lanes and turning without a signal are violations of Cleveland Codified Ordinances ("C.C.O.") 431.14. Finally, the state argued that during the lawful stop, officers observed a firearm in plain view, which justified a search for weapons that led to the discovery of contraband in the vehicle.

{¶ 6} Detective Joseph Hess ("Det. Hess") testified at the suppression hearing that he and Detective Christopher Allen ("Det. Allen") were patrolling an area near East 140th Street and Kinsman on November 8, 2019, at approximately 4:12 p.m., in a police vehicle equipped with lights and sirens. Sergeant Jarrod Durichko ("Sgt. Durichko") was also patrolling the area in an undercover vehicle. Sgt. Durichko notified Detectives Hess and Allen that he observed a white Jeep Compass driving erratically and changing lanes multiple times without signaling. (Tr. 19.) The Jeep traveled eastbound on Union Avenue and turned into a gas station located at East 140th Street and Kinsman Road.

{¶ 7} As Detectives Hess and Allen approached the location, Sgt. Durichko notified them that the same vehicle exited the gas station and turned onto the roadway again without signaling. (Tr. 20.) By that time, Detectives Hess and Allen had reached the location, pulled behind the Jeep, and initiated a traffic stop. (Tr. 20.) Sgt. Durichko did not conduct the traffic stop because he was in an undercover vehicle. (Tr. 20.)

{¶ 8} Det. Allen approached the driver's door and spoke to Stewart while Det. Hess approached the passenger side door and spoke with Ealom. (Tr. 21.) Det. Hess spoke with Ealom for approximately four minutes and then asked him to exit the vehicle for safety purposes and to facilitate communication. (Tr. 21.) As Ealom was exiting the vehicle, Det. Hess asked Ealom if he had any weapons on his person. (Tr. 22, 57.) Ealom replied: "Yes. I have a concealed carry." (Tr. 22, 71.) Det. Hess then observed a gun in the front-passenger door panel. (Tr. 22-23, 58.) Thereafter, Det. Hess placed Ealom in handcuffs for officer safety because Ealom failed to notify the officers that he had a concealed weapon. (Tr. 23-24.)

{¶ 9} Det. Hess rendered the weapon safe and searched the passenger compartment of the vehicle "for other weapons." (Tr. 25.) During the search, Det. Hess found multiple cell phones and a large roll of blank lottery tickets. (Tr. 25.) Det. Hess, who is a member of the Fourth District Vice Unit, testified based on his training and experience that these items were common "indicators of drug trafficking." (Tr. 25.) He explained that a blank roll of lottery tickets "is one of the No. 1 packaging materials for narcotics. It's up there with plastic baggies." (Tr. 26.) Det. Hess also found a digital scale with drug residue inside a pouch fastened to the back of the front passenger seat. (Tr. 27-28.)

{¶ 10} After finding the scale, the officers determined they had probable cause to search the rest of the vehicle. (Tr. 27.) In the back seat, the detectives found a hairbrush with a hidden compartment containing a bag of heroin and a bag of cocaine. (Tr. 28-29.) Detectives Hess and Allen then placed Stewart and Ealom

under arrest and cited Stewart with a change of course violation pursuant to C.C.O. 431.14.

{¶ 11} In granting the motions to suppress, the court concluded that the city's change of course ordinance only applies to public streets and, therefore, does not apply to parking lots where Stewart turned onto Union Avenue. The trial court's written decision did not address the other alleged traffic violations, namely changing lanes without signaling and erratic driving. The court determined that because Stewart did not violate any traffic ordinance by turning from a private parking lot onto a city street, the police had no reasonable justification for initiating the traffic stop of Stewart's vehicle and, therefore, the traffic stop violated the Fourth Amendment. The state now appeals the trial court's judgment pursuant to Crim.R. 12(K).

## II. Law and Analysis

### A. Standard of Review

{¶ 12} This court reviews a decision on a suppression motion under a mixed standard of review. "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). Therefore, a reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accepting the facts as true, the reviewing court must independently determine,

without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Id.* An appellate court reviews the trial court's application of the law to its factual findings under a de novo standard. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 100.

## B. The Traffic Stop

{¶ 13} The Fourth Amendment of the U.S. Constitution, which is enforceable against the states through the Due Process Clause of the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Article I, Section 14 of the Ohio Constitution has language almost identical to the Fourth Amendment and affords the same protections against unreasonable searches and seizures. *State v. Robinette*, 80 Ohio St.3d 234, 245, 685 N.E.2d 762 (1997).

{¶ 14} There are, however, exceptions to the Fourth Amendment's warrant requirement. Although stopping an automobile and detaining its occupants constitutes a "seizure" under the Fourth Amendment, "a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7, citing *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). *See also Dayton v. Erickson*, 76 Ohio St.3d 3, 11, 665 N.E.2d 1091 (1996)("[W]here an officer has an

articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid * * *.").

{¶ 15} It is well established that "'[a] police officer may [initiate] a traffic stop of any motorist *for any traffic infraction*, even if the officer's true motive is to detect more extensive criminal conduct.'" *State v. Hrtsyak*, 8th Dist. Cuyahoga No. 108506, 2020-Ohio-920, ¶ 21, quoting *State v. Bennett*, 8th Dist. Cuyahoga No. 86962, 2006-Ohio-4274 (emphasis sic). "'[C]ourts determine whether any violation occurred, not the extent of the violation.'" *Cleveland v. Martin*, 2018-Ohio-740, 107 N.E.3d 809 (8th Dist.), quoting *State v. Hodge*, 147 Ohio App.3d 550, 2002-Ohio-3053, 771 N.E.2d 331, ¶ 27 (7th Dist.).

{¶ 16} Detectives Hess and Allen stopped Stewart's car because Sgt. Durichko advised them that Stewart was "driving erratically and switched lanes multiple times without signaling." (Tr. 19.) C.C.O. 431.14, governs "Signals Before Changing Course, Turning, or Stopping," and provides, in relevant part:

> No person shall turn a vehicle * * * or move right or left upon a highway unless and until such person has exercised due care to ascertain that the movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.

C.C.O. 431.14(a)(1). Thus, C.C.O. 431.14(a)(1) requires one to use a turn signal when moving from right or left upon a highway. C.C.O. 401.61 defines the term "highway" as synonymous with the word "street" and includes "the entire width between the

boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular travel."

{¶ 17} The trial court concluded that the stop of Stewart's Jeep violated the Fourth Amendment because Stewart was not required to use a turn signal when turning out of the gas station parking lot onto a public street. The trial court found no evidence of a traffic violation that would justify the stop. However, as previously stated, the trial court's decision fails to address Stewart's other alleged traffic violations. Defense counsel asserted at oral argument that the trial court must have found that the testimony regarding other traffic violations was not credible based on video evidence provided by Det. Hess's body camera. In the video, which was played at the suppression hearing, Stewart seems to be seeking clarification as to the reason for the stop because he asks for confirmation that he was stopped for failing to use his turn signal. Det. Hess replies in the affirmative and tells Stewart that he failed to use a signal when he turned out of the gas station parking lot. Det. Hess does not mention the other traffic violations on the video.

{¶ 18} However, the video suggests that Det. Allen had previously told Stewart that he was stopped for failing to use his signal, but Det. Allen's conversation with Stewart preceded Det. Hess's interaction with him, and Det. Allen's explanation for the stop was not captured by Det. Hess's body camera. We, therefore, do not know what Det. Allen told Stewart regarding his failure to signal. Nevertheless, Det. Hess testified at the suppression hearing that Stewart was stopped, in part, because he failed to signal when he changed lanes. According to Det. Hess, Sgt. Durichko

also told Detectives Hess and Allen that Stewart had been "driving erratically." (Tr. 19.) Thus, there was evidence that Sgt. Durichko observed Stewart violate C.C.O. 431.14(a)(1) by "switching lanes multiple times without signaling" and by failing to exercise due care before moving right or left because he was "driving erratically." (Tr. 19.)

{¶ 19} The trial court completely ignored the evidence of the other traffic violations. This is not a case where the trial court found the evidence of other traffic violations lacking in credibility; the trial court made no finding at all with respect to that evidence. We, therefore, find the trial court's conclusion that Stewart did not commit a traffic violation is against the manifest weight of the evidence.

{¶ 20} As previously stated, a traffic stop is constitutionally valid where police have observed the driver commit a traffic violation. *Dayton*, 76 Ohio St.3d at 9, 11-12, 665 N.E.2d 1091. Although Detectives Hess and Allen did not witness the traffic violations, police may initiate investigatory stops based on the observations of other officers or citizens. *Lyndhurst v. Brickel*, 8th Dist. Cuyahoga No. 72322, 1998 Ohio App.LEXIS 2334 (May 28, 1998); *Beachwood v. Sims*, 98 Ohio App.3d 9, 14, 647 N.E.2d 821 (8th Dist.1994). Therefore, the traffic stop of Stewart's Jeep was constitutionally valid because Sgt. Durichko observed Stewart commit multiple traffic violations.

{¶ 21} Because the trial court found the traffic stop was unlawful, it did not analyze the legality of the interaction between the detectives and appellees following the initial stop. We have recognized that "'[w]hen a trial court's findings of fact are

inadequate and the record provides an appellate court with a sufficient basis to review appellant's assignments of error, the appellate court need not remand for the entry of findings of fact.'" *State v. Burrell*, 8th Dist. Cuyahoga No. 72113, 1998 Ohio App. LEXIS 1623, 9 (Apr. 16, 1998), quoting *Parma v. Reschke*, 8th Dist. Cuyahoga No. 58015, 1991 Ohio App. LEXIS 644, 4 (Feb. 14, 1991).

{¶ 22} After briefly talking with appellees during the traffic stop, Hess asked Ealom to step out of the Jeep. "[A]n officer can ask a person to exit a vehicle during a lawful traffic stop without having reasonable suspicion of any further criminal activity." *Cleveland v. Kalish*, 2018-Ohio-682, 106 N.E.3d 881, ¶ 26 (8th Dist.), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("Once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

{¶ 23} As previously stated, Det. Hess asked Ealom if he had any weapons on his person as he was exiting the car. Ealom responded, "Yes, I have a concealed carry." (Tr. 22, 71.) Det. Hess then observed a firearm in plain view in the front-passenger door panel. (Tr. 22-23.) The plain view doctrine is another exception to the Fourth Amendment's warrant requirement. *State v. Williams*, 55 Ohio St.2d 82, 377 N.E.2d 1013 (1978).

> In order for evidence to be seized under the plain view exception to the search warrant requirement it must be shown that (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the

incriminating nature of the evidence was immediately apparent to the seizing authorities.

*Id.* at paragraph one of the syllabus. *See also State v. Halczyszak*, 25 Ohio St.3d 301, 303, 496 N.E.2d 925 (1986).

{¶ 24} Having determined that the initial traffic stop was constitutional, the first of the three requirements necessary for the plain view doctrine to apply has been satisfied. With respect to the other two requirements, the Ohio Supreme Court has held that the "inadvertent discovery" requirement "may be satisfied when police lack antecedent probable cause, i.e., an advance particularized knowledge of, or intent to seize, those objects ultimately seized." *Halczyszak* at paragraph two of the syllabus. The "immediately apparent" requirement of the plain view doctrine is satisfied where police officers have probable cause to associate the object with criminal activity. *Id.* at paragraph three of the syllabus. "In ascertaining the required probable cause to satisfy the 'immediately apparent' requirement, police officers may rely on their specialized knowledge, training and experience * * *." *Id.* at paragraph four of the syllabus.

{¶ 25} Det. Hess observed the firearm in the front-passenger door panel as Ealom was exiting the car. The discovery was inadvertent because neither Det. Hess nor Det. Allen had any prior knowledge that the gun would be found in that location. The gun's incriminating nature was immediately apparent because Ealom failed to disclose its existence to police during the traffic stop as required by R.C. 2923.12(B)(1). R.C. 2923.12(B)(1) states, in relevant part, that "[n]o person who has

been issued a concealed handgun license shall * * * fail to promptly inform any law enforcement officer who approaches the person after the person has been stopped that the person has been issued a concealed handgun license and that the person then is carrying a concealed handgun[.]"

{¶ 26} The purpose of the duty to "promptly inform" an officer of a concealed weapon is to protect the officer's safety. *State v. Lyle*, 1st Dist. Hamilton No. C-190447, 2020-Ohio-4683. Courts interpreting the duty to promptly inform police of the existence of a concealed weapon have held that "to do something 'promptly' is to do it 'without delay and with reasonable speed.'" *State v. Griffin*, 1st Dist. Hamilton No. C-190369, 2020-Ohio-3707, ¶ 28, quoting *State v. Brown*, 168 Ohio App.3d 314, 2006-Ohio-4174, 859 N.E.2d 1017, ¶ 23 (11th Dist.). *See also Lyle* at ¶ 26-27 (holding that there was insufficient evidence of a concealed weapons violation because the defendant promptly informed police that he had a firearm while the interaction with police was still consensual and had not yet become a "stop" for law enforcement purposes). Indeed, the plain meaning of the word "promptly" is defined as "without delay[,] very quickly or immediately." Merriam-Webster.com dictionary, "promptly" available at Merriam-Webster, https://www.merriam-webster.com/dictionary/promptly (accessed July 9, 2021).

{¶ 27} Stewart and Ealom were legally stopped due to traffic violations. Ealom did not notify police that he had a firearm in his possession until after conversing with police for approximately four minutes and not until after Det. Hess asked him if he had any weapons on his person. (Tr. 21.) Therefore, Ealom's failure

to promptly notify police of the concealed weapon constituted a carrying a concealed weapons offense in violation of R.C. 2923.12(B).[1] *See State v. Nelson*, 2d Dist. Montgomery No. 22718, 2009-Ohio-2546, ¶ 46 (Defendant's failure to inform police officers of a concealed weapon as required by R.C. 2923.12(B)(1) gave officers probable cause to believe the gun was evidence of a carrying concealed weapon violation.); *State v. White*, 8th Dist. Cuyahoga No. 92229, 2009-Ohio-5557, ¶ 14 (holding that defendant violated R.C. 2923.12(B)(1) where defendant voluntarily produced an Ohio I.D. to police but failed to inform police of the presence of a firearm in the vehicle during the exchange). Thus, Det. Hess properly seized the gun pursuant to the plain view doctrine.

{¶ 28} Having discovered a concealed weapon in the Jeep, Detectives Hess and Allen had probable cause to search the Jeep. Under the automobile exception, police may search a vehicle without a warrant if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search or seizure. *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992); *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.E.2d 442 (1999). "A vehicle's mobility is the traditional justification for this exception to the warrant requirement." *State v. Warnick*, 2d Dist. Miami No. 2019-CA-14, 2020-Ohio-4240, ¶ 30, citing *Mills* at 367; *Dyson* at 467. "[T]he automobile exception does not have

---

[1] R.C. 2923.12(B) provides that "[n]o person who has been issued a concealed handgun license shall * * * fail to promptly inform any law enforcement officer who approaches the person after the person has been stopped that the person has been issued a concealed handgun license and that the person then is carrying a concealed handgun[.]"

a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment * * * permits police to search the vehicle without more.'" *Dyson* at 467, quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996).

{¶ 29} Having found an undisclosed concealed weapon in the Jeep, Detectives Hess and Allen had probable cause to search the vehicle for additional weapons. In *State v. White*, 8th Dist. Cuyahoga No. 92229, 2009-Ohio-5557, we held that police had probable cause to search the defendant's vehicle after learning that he violated R.C. 2923.12(B)(1) by failing to inform police during a stop that he was carrying a concealed weapon. *See also State v. Fields*, 4th Dist. Athens No. 96CA1742, 1996 Ohio App. LEXIS 5558 (Dec. 2, 1996) (holding that police had probable cause to search the defendant's vehicle after learning that he illegally possessed a concealed weapon in the trunk).

{¶ 30} As previously stated, Ealom committed a concealed weapons violation by failing to disclose the existence of his gun to police during the traffic stop. Therefore, Detectives Hess and Allen had probable cause to search the Jeep for additional weapons without a warrant.

{¶ 31} While searching the Jeep for weapons, Det. Hess found multiple cell phones and a large roll of blank lottery tickets. (Tr. 25.) Det. Hess testified, based on his training and experience investigating drug trafficking, that these items were "indicators of drug trafficking." (Tr. 25.) The Ohio Supreme Court has held that the discovery of other indicia of criminal activity in the vehicle during a search gives rise

to probable cause to search other areas of the vehicle, including containers that could contain contraband. *State v. Vega*, 154 Ohio St.3d 569, 2018-Ohio-4002, 116 N.E.3d 1262, ¶ 20; *State v. Taylor*, 8th Dist. Cuyahoga No. 108322, 2020-Ohio-5079, ¶ 15 (en banc).

{¶ 32} After finding a roll of blank lottery tickets, Detectives Hess and Allen searched the back seat of the car, including a pouch affixed to the back of the passenger seat, where they found a scale with drug residue. They also found bags of cocaine and heroin inside a hidden compartment of a hairbrush. Because they had probable cause to search the vehicle, we find the search was lawful, and the evidence found during the search should not have been suppressed.

{¶ 33} We, therefore, sustain the sole assignment of error.

{¶ 34} Judgment reversed. We remand the case to the trial court for trial.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

SEAN C. GALLAGHER, P.J., CONCURS WITH SEPARATE ATTACHED OPINION;
LARRY A. JONES, SR., J., DISSENTS WITH SEPARATE ATTACHED OPINION

SEAN C. GALLAGHER, P.J., CONCURRING:

{¶ 35} I concur fully with the majority, but write separately to briefly discuss the type of police enforcement underlying the facts of this case.

{¶ 36} Traffic enforcement should normally be conducted by a uniformed officer in a marked cruiser and stops initiated to enforce traffic infractions. *Parma Hts. v. Nugent*, 92 Ohio Misc.2d 67, 700 N.E.2d 430 (M.C.1998). The practice of undercover observation coupled with calling in uniformed officers in a marked cruiser (who saw nothing of the original traffic violation) will invariably raise surveillance concerns when part of a concerted effort to stop motorists for further investigations based on the pretext of spotting traffic infractions. Crimes are indeed uncovered and thwarted at times by such practices, but of course, that conduct comes at a price in the relationship between police officers and citizens.

{¶ 37} There is certainly a lesser expectation of privacy in a motor vehicle, but the fine line between police enforcement and the protections of the Fourth Amendment are put to the test in scenarios as the one that played out in this case.

The decision in this case hinged on a few critical facts that if slightly different could have taken the outcome in another direction.

{¶ 38} Officers face difficult challenges in enforcing laws, but it is always important for them to assess their methods and how those methods impact the community they serve. Although I share some of the concerns raised in this case, the law compels reversal.

LARRY A. JONES, J., DISSENTING:

{¶ 39} I respectfully dissent. Of particular concern to me in this case is the majority's finding that "Ealom's failure to notify police of the concealed weapon constituted a carrying-a-concealed-weapons offense in violation of R.C. 2923.12(B)." I would find that Ealom properly notified the police that he had a concealed weapon and license to carry one.

{¶ 40} Specifically, when Detective Hess asked Ealom if he had any weapons on his person, Ealom responded, "Yes. I have a concealed carry." The record demonstrates that Ealom indeed had a license to carry a concealed weapon, but the majority finds that Ealom did not "promptly inform" the police of the weapon and that he had a license to have it. R.C. 2923.12(B). The majority cites *State v. Lyle*, 1st Dist. Hamilton No. C-190447, 2020-Ohio-4683, *State v. Nelson*, 2d Dist. Montgomery No. 22718, 2009-Ohio-2546, and *State v. White*, 8th Dist. Cuyahoga No. 92229, 2009-Ohio-5557, in support of its finding that Ealom failed to properly inform the police of the weapon. I believe *Lyle* is more supportive of my position

that Ealom properly notified the police of his carrying concealed weapon license, and I find *Nelson* and *White* distinguishable from this case.

{¶ 41} In *Nelson*, an officer stopped the defendant after observing the vehicle the defendant was driving cross over the right shoulder lane line. In speaking with the defendant, the officer noticed that the defendant was extremely nervous and unable to accurately tell the officer where he was headed. Therefore, the officer called for back-up assistance. When another officer arrived, a pat-down search of the defendant was performed and revealed an empty gun holster. The police asked the defendant where the gun was; the defendant responded that it was in the car between the seats. As the defendant was being placed in the police cruiser, another officer saw "in plain sight, the handle of a gun between the driver and passenger seats." *Id.* at ¶ 14. The police questioned the defendant about the gun. He admitted that it was his and that he did *not* have a carrying concealed weapon license. He was charged with and convicted of improperly handling a firearm in a motor vehicle. The conviction was upheld on appeal.

{¶ 42} *Nelson* is distinguishable from this case for two reasons. First, the timing is different. In *Nelson*, the defendant was already out of his vehicle when the police discovered that he had a gun. Here, Ealom told the police that he had a gun as he was exiting the vehicle. Second, and most importantly, the defendant in *Nelson* did not have a carrying-concealed-weapon license, while, here, Ealom did.

{¶ 43} Likewise, in *White*, after the defendant was ordered out of his vehicle so that he could be placed under arrest, he informed the police that he "thought"

there was a gun in the vehicle, and his mother had put it in the center console. *Id.* at ¶ 6. The police did retrieve a gun from the vehicle, and the defendant's mother denied the gun was hers. Most importantly, the defendant in *White* did *not* have a carrying-concealed- weapon license.

{¶ 44} This case is more akin to *Lyle*, 1st Dist. Hamilton No. C-190447, 2020-Ohio-4683. In *Lyle*, the defendant (Lyle), like Ealom here, was convicted of carrying a concealed weapon for failing to promptly inform the officers that he possessed a concealed handgun license and that there was a firearm in the vehicle. Lyle was a passenger in a parked vehicle (Ealom was a passenger in Stewart's vehicle in this case). The police were in the area of the parked vehicle, responding to a report of gunshots. When the police saw that Lyle and another person were in the vehicle, they began to approach. As they approached the vehicle, one of the officers saw Lyle twice turn toward the back seat and then back to the front.

{¶ 45} One of the officers approached the front passenger door, where Lyle was seated, and asked Lyle to roll the window down, which Lyle did. The officer asked Lyle and the driver if they had heard any gunshots; both responded that they had not. According to the officer, "at that point he could smell burnt and raw marijuana coming from the vehicle, could see marijuana residue on the driver's pants, and observed what appeared to be an open container of alcohol in the center console." *Id.* at ¶ 5. The officer did not mention what he observed to the driver or Lyle at that time, however.

{¶ 46} The officer asked the driver if he could talk to him briefly. As the officer walked over to the driver's side door, he asked another officer to watch the passenger's side, where Lyle was. The driver got out of the car and walked back toward the other officer. The officer ordered the driver to face the car and patted him down. The officer then asked the driver, "Hey, where's your weed at?" *Id.* at ¶ 6. The driver denied having any. The officer then handcuffed the driver, sat him down on the curb, and questioned him about the marijuana. Three minutes and ten seconds into the video, the officer standing by Lyle's door turned toward the other officer and said, "There's a gun in the backseat." *Id.*

{¶ 47} The officer who was by Lyle told him, "I'm going to put you in handcuffs alright? You're not in trouble, but we're going to put you in handcuffs." *Id.* at ¶ 7. While the police removed Lyle from the car and patted him down, Lyle told them that he had a carrying-concealed-weapon license; the police found his license in his wallet. The police asked Lyle why he had not told them earlier, and Lyle said that he had told the one officer that had been standing by his door. The officer who conducted the pat-down search testified that during the pat-down he discovered that Lyle was wearing an empty holster, prompting him to believe that Lyle had moved the firearm to the backseat as the police approached the car.

{¶ 48} The police retrieved the firearm, which had been partially hidden under a booster seat in the backseat of the car. Lyle was charged for failing to

promptly inform the officers of the firearm and his license.[2] After a bench trial, Lyle was found guilty of carrying a concealed weapon in violation of R.C. 2923.12(B)(1) for failing to promptly inform the officers that he possessed a concealed-handgun license and that there was a firearm in the vehicle. Lyle appealed, contending that the evidence was insufficient to sustain the conviction. The First Appellate District agreed.

{¶ 49} The first issue presented in *Lyle*—at what point during the interaction was Lyle stopped for a law-enforcement purpose — is not at issue in this case. Here, the stop was for a law-enforcement purpose from the beginning. But the second issue presented in *Lyle* — when stopped, did Lyle "promptly inform" the police of the firearm and that he had a license — is, in my opinion, the salient issue in this case. R.C. 2923.112(B)(1). I believe Ealom promptly informed the police.

{¶ 50} In *Lyle*, the First Appellate District held that Lyle's initial interaction with the police was a consensual encounter, but became a law-enforcement stop when the "officers prepared to remove him from the vehicle, by which time defendant had informed a deputy of the firearm, and informed him shortly thereafter that he possessed a concealed-handgun license." *Id.* at ¶ 27. That was after the police had already spotted the weapon in plain view. Yet still, the First Appellate District found that Lyle timely informed the police that he had a weapon. Here, Ealom informed the police of the gun as he was being removed from the

---

[2] Fentanyl was also discovered in the vehicle, but the grand jury did not charge Lyle with that.

vehicle, and prior to the police seeing it. In my view, he properly informed them; therefore, the subsequent search of the car, which was based on the police's view that they were not properly informed, was invalid.

{¶ 51} Therefore, I believe the evidence found as a result of the search should have been suppressed; I would affirm the trial court's decision granting Stewart and Ealom's motions to suppress and overrule the state's assignment of error.